**BROUSE v. MIERS.**

No. 14702.

Court of Civil Appeals of Texas.

Dallas.

Sept. 25, 1953.

Rehearing Denied Oct. 23, 1953.

Townsend & Townsend, Dallas, for appellant.

A. C. Scurlock, Dallas, for appellee.

CRAMER, Justice.

This action was originally filed by Miers against Brouse and the Mercantile National Bank at Dallas, Miers asserting ownership of one-half of a fund on deposit with the Bank in the name of Brouse, together with certain rights under a partnership, joint adventure, or other joint relationship between them, and for an accounting. Prior to the order here appealed from, the trial court granted its temporary injunction enjoining Brouse from disposing of the fund involved. Miers filed a bond in the sum set by the trial court and the writ issued. A motion for summary judgment filed by Brouse was overruled August 6, 1951. On December 17, 1952 a motion to dissolve was filed, which was overruled March 3, 1953. This appeal has been duly perfected from that order.

On the hearing here involved Miers asserted the relationship between him and Brouse was created by certain written agreements and powers of attorney executed by landowners to Brouse, and thereafter by separate agreements between him and Brouse, based on said contracts with landowners and held by Brouse. Miers' claim was that by reason of the later agreement between himself and Brouse they were joint owners and/or partners as to each other, and that they each acquired an economic interest in said fund and in the lands covered by the Brouse contracts with the landowners.

The contracts between the several owners and Brouse, although varying in certain details, were, whether written or oral, substantially the same; one of them, typical of all, omitting formal parts, being as follows:

"After my conversation relative to my handling your West Dallas acreage, I had Myers and Noyes make a survey of same,

with a view toward cutting it up to the best advantage, and at the same time have a plat acceptable to the City Plan Commission. The attached map, accepted and approved, is the finished product.

"Tying in with Homestead Manor on the south, this tract will really be a continuation of same, making it easy to continue to sell to the same class of negroes that have bought and built in the immediate*ly* vicinity. Our plan is to so price the lots, they will average a little better than $200.00, and bring in a gross of over 20,-000 dollars.

"We, as agents propose to pay the cost of engineering grading and graveling the streets, sell, collect and keep books on all sales out of our agreed commission of 40%.

"Lots will be sold for $5.00 down and $5.00 per month, on contract, deed to be delivered only when 1/2 the principal has been paid. Either on unpaid balances or accrued, or included in the monthly payment, interest of 8% will be paid.

"The first monies paid in will go toward defraying the cost of engineering and grading, after which we will divide the receipts, each month 40 and 60 but until such time as the engineering and grading account has been reimbursed, we will draw for ourselves but 20%.

"We propose to keep a complete set of books, open to you at all times, render statement each first of the month, and make remittances to you not later than the 10th of each month until the entire addition has been successfully sold.

"To show you the interest already manifested—7 in all, negroes have either selected lots, and have given in money to hold until the sale begins, or have picked them out and asked that we come and get the money.

"While our terms are stated above, there will be many larger cash payments and some will be sold for all cash less 10%. Some of the lots selected and a deposit made, are on a tentative price of $225.00 plus 10% for graveling. So—we know it can be sold, as we have outlined to you

and while it could not be sold in bulk for more than $300.00. Our way, if successful, will considerably more than double the amount,—maybe triple it.

"One thing more, it will be absolutely necessary for the person now occupying the property (to) vacate at the earliest possible moment, and while he remains, our salesmen must not be ordered off the premises, with a shot gun. I am sure this man can be handled in a business like manner, but until he understands,—from you— that the property is to be sub-divided, we cannot make much progress. If you gentlemen approve this letter, in its entirety, please signify your co-operation by signing and returning one copy to my office.

"If any change is desired, do not hesitate to discuss it, or write me your own views."

The agreements between Brouse and Miers were all substantially the same, one of them, omitting names of landowners and formal parts, being as follows:

"This memo of agreement made this 26th day of April, 1943 by and between H. W. Brouse of Dallas, Texas, first party, and H. W. Miers of Dallas, Texas, second party,

"Witnesseth: That, whereas, first party has entered into a contract with * * * of Dallas, Texas, to plat, do engineering work, grade and gravel streets on a small tract of land in West Dallas, tying in with what is known as 'Homestead Manor' on the South and act as Exclusive Sales agent for said acreage or lots when said plat is filed; to pay cost of engineering, map or plat, grading and graveling of streets and all expenses connected with the sale of said lots; to collect all cash payments and installments made and to be made on lots sold; keep books of accounts and after paying engineers, grading and graveling costs, to divide the profits on a basis of forty per cent (40%) to H. W. Brouse and sixty per cent (60%) to * * *; and Whereas, Harris W. Miers, second party, has associated himself with H. W. Brouse, first party, to carry out said con-

tract with * * *, and agrees to give his time necessary to accomplish the purposes of said contract and to cooperate with H. W. Brouse in said sales and turn in all sales contracts and money collected, to H. W. Brouse, who shall keep *acrroct* books of account, to be subject to the inspection of said Miers at reasonable times and after payment of all costs and expenses incident to carrying out said contract, to receive from H. W. Brouse one-half of the net profits from and through said contract with * * *, as, only and when received in cash collected, and after the payment of all costs, expenses accrued hereunder.

"Therefore, for and in consideration of the premises and mutual agreements herein contained I, H. W. Brouse, agree and do assign a one-half interest in said * * * contract, to H. W. Miers and I, Harris W. Miers, do hereby accept such assignment and do hereby assume one-half of all burdens and obligations imposed on H. W. Brouse in said contract with ·* * *, hereby agreeing to pay one-half of costs of carrying out said contract and one-half the losses, if any, sustained by H. W. Brouse thereunder and to do and perform the things required of me hereunder.

"Neither party shall receive any compensation for services performed by him hereunder. * * *."

Material here the record shows Miers did not allege that he secured a real estate dealer's or salesman's license and that Miers and Brouse by stipulation agreed that Miers had been a licensed dealer a short time before their present arrangement and the entry into the contracts here involved, but that Miers was not such a licensed dealer or salesman at the time of the entry into the arrangements here involved, or at any time during such relationship.

Miers contended that because he operated under powers of attorney from the original fee owners of the land he came within certain of the exceptions set out in Art. 6573a, Vernon's Ann.Civ.St.

Brouse based his defense on the ground that the contracts involved were conditional contracts between himself and the landowners which imposed obligations upon each party for which he was to be paid a real estate dealer's commission within the terms of Art. 6573a, supra; and that his subcontracts with Miers did not bring Miers within the exceptions provided in such Article; that since Miers did not have a license under the Act, he (Brouse) would, if he shared a commission with Miers, violate the Act and subject himself under section 21 thereof not only to the cancellation of his license, but to the criminal penalties not to exceed a $500 fine, or confinement in the county jail not to exceed six months, or both such fine and imprisonment.

Brouse's points on this appeal in substance assert error in the overruling of his motion to dissolve the temporary injunction (1) because Miers sued to recover one-half of the commission paid to Brouse under contracts for the sale of real estate without alleging that he had at the time a license as a real estate dealer or salesman under Art. 6573a, V.A.C.S.; (2) because Miers' pleading does not show a cause of action against Brouse since this is a suit to recover one-half of the commissions on a sale of real estate by Brouse and Miers and no allegation is made by Miers that he had a license at the time under Art. 6573a, supra; (3) because the undisputed evidence shows Miers did not come under any of the exceptions in section 3 of Art. 6573a; but does show (a) he did not have a license required by Art. 6573a, (b) or a license under Art. 600a, V.A.C.S., the Securities Act, (c) has never been a licensed attorney, (d) he has not been a licensed real estate dealer or salesman since Dec. 31, 1946, (e) Miers' cause of action, if any, arose since June 1950, and (f) that Miers is not and was not the owner or one of the owners of the property involved. (4) In overruling Brouse's motion to dissolve the temporary injunction the court adjudicated the prime issue in the main suit and held one-half of the commission paid Brouse was owned by

Miers. (5) Because the temporary injunction accomplished the main purpose of the suit; and (6) because the issues here involved are res adjudicata.

Appellee's seven counter points in substance assert that Miers (1) operated and did business under a power of attorney from each of the original fee owners of the several tracts of land involved; (2) that he and Brouse operated and did business as partners,—were joint adventurers for "profits," not "commissions"; (3) that Miers owned an interest in the enterprise including its property; (4) that the " * * * money, the funds, directly subject to the temporary injunction is the property of appellee Miers. Appellant Brouse has no interest in or to the same and has no charge or claim against it." (5) That he measured up to the spirit and substance of the statute of frauds and was exempt under Art. 6573a from having a dealer's or a salesman's license for the transactions in question; (6) that the rulings of the several district courts on his plea are in the nature of res adjudicata; and (7) that the protection of the trust fund known as the "gravel money" is dependent upon the temporary injunction and it should not be dissolved.

All points and counter points will be considered together.

Art. 6573a, sections 2, 3, and 4, defines the terms "Real Estate Dealer" and "Real Estate Salesman", as follows:

"Sec. 2. The following terms shall, unless the context otherwise indicates, have the following meanings: (a). (1). The term 'Real Estate Dealer' shall include every person or company, other than a salesmen, and licensed and registered attorneys, who for another or others for compensation or other valuable consideration, or who with the intention or in the expectation or upon the promise of receiving or collecting compensation or other valuable consideration, lists for sale, sells, exchanges, buys, or rents, or offers, or attempts, or agrees to negotiate a sale, exchange, purchase, or rental of an estate or interest in real estate, or collects, or offers, or attempts, or agrees to collect rent for the use of real estate, or negotiates, or offers, or attempts, or agrees to negotiate a loan, secured or to be secured by mortgage or other incumbrance upon or transfer of real estate; or auctions, or offers, or attempts, or agrees to auction any real estate; or appraises, or offers, or attempts, or agrees to appraise any real estate; or who advertises, or holds itself, himself, or themselves out as engaged in the business of selling, exchanging, buying, renting, or leasing real estate, or assists or directs in the procuring of prospects, or the negotiation or closing of any transaction which does or is calculated to result in the sale, exchange, leasing, or renting of any real estate, or who buys or offers to buy, sells or offers to sell, or otherwise deals in options on real estate or in the improvements thereon.

"(2). The term 'Real Estate Dealer' shall also include any person or company employed by or on behalf of the owner or owners of lots or other parcels of real estate at a stated salary, or upon a commission, or upon a salary and commission basis, or otherwise, to sell such real estate in any parts thereof, in lots or other parcels, and who shall sell or exchange, or offers, or attempts, or agrees to negotiate the sale or exchange of any such lot or parcel of real estate; provided, however, if the owner of lots or other parcels is engaged in the business of buying, selling, exchanging, leasing, renting of property and holding himself out as a full or part-time dealer in real estate, then such person employed by said owner may be licensed as a salesman of said owner if said owner has been licensed as a dealer in real estate.

"(3). The term 'Real Estate Dealer' shall also include any person or company engaged in the business of buying, selling, exchanging, leasing, renting of property on his or its own account and holding himself or itself out as a full or part-time dealer in real estate.

"(b). The term 'Real Estate Salesman' shall mean and include any person or com-

pany employed or engaged by or in behalf of a licensed real estate dealer to do or deal in any act, acts, or transactions set out and comprehended by the definition of a 'Real Estate Dealer' in Section 2, Subsection (a) of this Act.

"(c). If the sense requires it, words in the present tense include the future tense; in the masculine gender, include the feminine or neuter gender; in the singular number, include the plural number; in the plural number, include the singular number; 'and' may be read 'or'; and 'or' may be read 'and.'

"Persons not covered by act

"Sec. 3. The provisions of this Act shall not apply to, and the terms 'Real Estate Dealer' and 'Real Estate Salesman,' as above defined, shall not include:

"(a). Any person or company who, as owner or lessor, shall perform any of the acts set out in Section 2, Subdivision (a) with reference to property owned or leased by them, or to the regular employees thereof with reference to the property owned or leased by such person or company where such acts are performed in the regular course of, or as incident to, the management of such property and the investment therein, unless such person or company is engaged in the business of buying, selling, exchanging, leasing, or renting of property and holding himself or itself out as a full or part-time dealer in real estate.

"(b). Persons acting as an attorney in fact under a duly executed power of attorney from the owner authorizing the final consummation by performance of any contract for the sale, leasing, or exchange of real estate; services rendered by an attorney at law, receiver, trustee in bankruptcy, administrator, or executor, or any person doing any of the acts specified in Section 2, Subdivision (a) of this Act under order of any court; a trustee acting under a trust agreement, deed of trust, or will, or the regular salaried employees thereof.

"(c). Any person, partnership, or corporation who has secured a license under

Texas Securities' Act, House Bill No. 521, Regular Session, Forty-fourth Legislature. (Article 600a, Vernon's P.C. art. 1083a.)

'Real estate dealer;' 'real estate salesman'

"Sec. 4. Any one act set out in Section 2, Subdivision (a) of this Act when performed for another or others for compensation or valuable consideration or who with the intention or in the expectation or upon the promise of receiving or collecting compensation shall constitute a person or company performing, offering or attempting to perform such act or acts, a real estate dealer or a real estate salesman within the meaning of this Act."

Section 13 provides that no person shall bring or maintain a suit for performing any of the acts mentioned in sections 2, 3 and 4 above quoted, without both alleging and proving that he was a duly licensed dealer or salesman at the time the cause of action arose.

Section 20 provides:

"It shall be unlawful for any real estate dealer or real estate salesman to offer, promise, allow, give, or pay directly or indirectly any part or share of his commission or compensation arising or accruing from any real estate transaction to any person who is not a licensed dealer or salesman in consideration of services performed or to be performed by such unlicensed person, and no real estate salesman shall be employed by or accept compensation from any person other than the dealer under whom he is at the time licensed, and it shall be unlawful for any licensed real estate salesman to pay a commission to any person except through the dealer under whom he is at the time licensed."

Section 21 provides a penalty for the violation of the Act of no more than a $500 fine or more than one year in jail, or both such fine and imprisonment.

■ Under the statutory definitions of both "Real Estate Dealer" and "Real Es-

tate Salesman", the contract between Brouse and the landowners, and the sub-contract, Brouse and Miers were operating and doing business as real estate dealers and salesmen. The very purpose of their agreements was to plat, subdivide, grade and gravel the streets, and to sell (for small down payments) real property "as agents" for the owners for an agreed commission of 40% of the net realized, after cost of engineering and grading had been deducted.

■ The power of attorney above quoted, depended upon by Miers to place him within the exemptions of the statute, did not authorize the execution of deeds. It was not acknowledged so as to be eligible for filing with the County Clerk as a power of attorney. See Art. 6633, V.A.C.S.

His asserted contention is completely answered in Trentman Co. v. Brown, 176 La. 854, 147 So. 14, 15, where the court there held:

"The act (section 2) declares that its provisions shall not apply to those who 'as owner or lessor, shall either individually or through an employee or representative not otherwise engaged in the real estate business perform any of the acts aforesaid with reference to property owned by them,' nor to persons 'holding a duly executed power of attorney from the owner for the sale, leasing or rental of real estate,' nor to an attorney at law rendering services to a client.

"Reading these provisions together, we think that the person 'holding a duly executed power of attorney from the owner' means one 'not otherwise engaged in the business of real estate,' who is acting as the 'alter ego' of an owner in an isolated transaction. It does not mean that one who is engaged in the business of real estate broker may exempt himself from the operation of the act by taking in each instance a power of attorney from the owner whose property he is seeking to sell. If the act meant this, it would soon be worthless as a piece of legislation, for brokers would then in all cases take some formal power of attorney, instead of an informal

authority to sell, as they do now. And in this case plaintiffs are engaged generally in the real estate business; and the fact that their contract with the owner made them the 'exclusive selling agents * * * with the power, purpose, and exclusive right, in their discretion, to sell according to the attached contract (which provided that the final deed should be executed by the owner),' does not change the situation. They were not the persons 'holding a power of attorney' contemplated by the act, but were purely and simply brokers engaged in selling real estate for the owner, though with the exclusive right to do so."

We adopt the reasoning in that case and must hold against Miers' claim under the exceptions in Article 6573a.

Miers also contends that he and Brouse operated as partners,—joint adventurers, for "profits," not "commissions." The original contract between the owners and Brouse provided: "We, as agents, propose to pay * * * out of our original commission of 40% * * *." The subcontract between Miers and Brouse provides that they propose to do certain work "* * * and act as exclusive sales agent for said acreage or lots when said plat is filed; * * *."

■ The original contract was the basis of all dealings between Brouse and the landowners and the subcontract was the basis of all dealings between Brouse and Miers. The subcontract could not change the effect of the original contract between the landowners and Brouse. Brouse in taking in an associate in the transaction acted independently of the owners. The contracts and subcontracts, in our opinion, on their face make the moneys here involved commissions on the sale of real estate. We therefore overrule appellee's contention to the contrary. Miers next asserts that he owned an interest in the enterprise, including its property. As we have stated above, the interest, if any, owned by Miers was only the right, under Brouse, to one-half of the commissions (20%) after deducting expenses. He next asserts that the money involved is his prop-

erty. Such money was paid to Brouse by the purchasers of the lots. He was entitled to collect such moneys under his contract with the owners of the real estate. Miers had no direct contractual relation with the owners. Miers' rights were limited to terms of the subcontract between him and Brouse. In our opinion the moneys involved were "commissions" as that term is used in Art. 6573a. Under sec. 20 of Art. 6573a, the statute not only prohibits Brouse from dividing such "commissions" with Miers (since he had no license under the Act), but under sec. 21 subjects him to severe criminal penalties if he should so divide such money.

Miers further asserts that the matters here are res adjudicata, based on the former temporary orders referred to above. The record shows the court granted the original temporary injunction and overruled the motion for summary judgment; that Brouse did not appeal from either order, but here appeals only from the order overruling his motion to dismiss, signed March 3, 1953.

The order granting the temporary injunction could not be the basis of res adjudicata since it is only an interlocutory order. Midland Building & Loan, etc. v. Sparks Chapel Colored M. E. Church, Tex. Civ.App., 35 S.W.2d 774.

The order overruling the motion for summary judgment was also an interlocutory and nonappealable order. Such contention is overruled.

Miers in his counter point 7 brings in issue the so-called gravel money, about $1,203.11. This, plus $308.31, or a total of $1,511.50, was collected from purchasers of lots—$15 per lot—in addition to the price of the lot, and was to be put in a trust fund, out of which trust fund there was to be expended amounts necessary for the graveling of the streets in front of all lots sold. This money, in so far as both Miers and Brouse are concerned, was a trust fund and should in all good conscience be preserved for the purpose for which it was collected. Miers, as to the purchasers, is charged jointly with Brouse in the faithful carrying out of said trust. We therefore hold that as to the purchasers, Brouse and Miers are co-trustees of said fund, and each charged with the faithful carrying out of the trust obligation.

For the reasons stated, appellant's points are sustained and appellee's counter points are overruled with the exception of counter point 7. In that connection the injunction heretofore granted and here appealed from should be so modified as to preserve the $1,511.50 for the purpose for which it was created, that is, it is to be used only for the purpose of graveling the streets in front of the property sold.

The judgment below is reversed and judgment is here rendered in accordance with the holdings in this opinion.